**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| Saratoga Lane, LLC, individually and on behalf of all others similarly situated, | : : | Civil Action No. |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| JTEKT Corporation, JTEKT Automotive North America, Inc. d/b/a JTEKT North America, Inc., Showa Corporation, American Showa, Inc., Yamada Manufacturing Co., Ltd., Yamada North America, Inc., | : : : : : | |
| Defendants. | : | |
| _____ | : | |

**CLASS ACTION COMPLAINT**

Plaintiff Saratoga Lane LLC, individually and on behalf of a proposed class of direct purchasers of Electric Powered Steering Assemblies, brings this class action against Defendants under the federal antitrust laws for treble damages and alleges as follows.

**NATURE OF THE CASE**

1.     Beginning at least as early as January 2005, the Defendants and their co-conspirators—United States and global manufacturers and suppliers of Electric Powered Steering Assemblies —violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Electric Powered Steering Assemblies sold in the United States and elsewhere at supra-competitive levels. As a result of this unlawful conduct, Plaintiff and other Class members paid artificially inflated prices for Electric Powered Steering Assemblies and have suffered antitrust injury to their business, property, or rights.

2.     Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), and asserts the following allegations on information and belief, except as to those paragraphs that

pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigation made by their attorneys.

## DEFINITIONS

3.      The term "Electric Powered Steering Assemblies," as used in this Complaint, includes both Electric Powered Steering Assemblies and pinion-assist type Electric Powered Steering Assemblies, all component parts of the assemblies, including the steering column, intermediate shaft, electronic control unit, and electric power steering motors, as well as manual steering columns, whether sold as a unitary system, as part of a broader system, or as separate components. Electric Powered Steering Assemblies, which are defined to include electric power steering motors, provide electronic power to assist the driver with steering the automobile. Electric Powered Steering Assemblies link the steering wheel to the wheels, and include the steering column, intermediate shaft, and electronic control unit. Pinion-assist type Electric Powered Steering Assemblies, a subset of Electric Powered Steering Assemblies, provide power to the steering gear pinion shaft from electric motors. Pinion-assist type Electric Powered Steering Assemblies include the electronic control unit and link the steering wheel to the wheels. Steering columns are manual (non-electric or non-hydraulic-powered) steering columns.

4.      The "Class Period" is from at least as early as January 2005 to September 2012.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

6.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

7.      Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

8.      The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

9.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Electric Powered Steering Assemblies throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

**THE PARTIES**

*Plaintiff*

10.     Plaintiff Saratoga Lane LLC ("Plaintiff") is an Illinois limited liability company with its principal place of business in Illinois. Plaintiff is successor in interest to certain assets of the Collins & Aikman Post-Consummation Trust of Collins & Aikman Corporation and its related debtor entities, including Collins & Aikman Products Co. ("Collins & Aikman"), which

was a Michigan corporation with its principal place of business in Michigan. Collins & Aikman purchased Electric Powered Steering Assemblies directly from Defendants or their co-conspirators during the Class Period.

*Defendants*

11.     Defendant JTEKT Corporation is a Japanese company with its principal place of business in Osaka, Japan. JTEKT Corporation, directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold Electric Powered Steering Assemblies that were purchased throughout the United States, including in this District, during the Class Period.

12.     Defendant JTEKT Automotive North America, Inc. (d/b/a JTEKT North America, Inc.) is a Delaware corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, JTEKT North America Corporation. Defendant JTEKT Automotive North America, Inc., directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold Electric Powered Steering Assemblies that were purchased throughout the United States, including in this District, during the Class Period.

13.     Defendant Showa Corporation is a Japanese company with its principal place of business in Saitama, Japan. Showa Corporation, directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold Electric Powered Steering Assemblies that were purchased throughout the United States, including in this District, during the Class Period.

14.     Defendant American Showa, Inc. is an Ohio corporation with its principal place of business in Sunbury, Ohio. It is a subsidiary of and wholly owned and/or controlled by its

parent, Showa Corporation. Defendant American Showa, Inc., directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold Electric Powered Steering Assemblies that were purchased throughout the United States, including in this District, during the Class Period.

15.     Defendant Yamada Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Kiryu City, Gunma Prefecture, Japan. Yamada Manufacturing Co., Ltd., directly and/or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and/or sold Electric Powered Steering Assemblies that were purchased throughout the United States, including in this District, during the Class Period.

16.     Defendant Yamada North America, Inc. is an Ohio corporation with its principal place of business in South Charleston, Ohio. It is a subsidiary of, and wholly owned or controlled by, its parent, Yamada Manufacturing Co., Ltd. Defendant Yamada North America, Inc. sold Electric Powered Steering Assemblies that were purchased in the United States, including in this District, during the Class Period.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

17.     The acts alleged to have been done by the Defendants were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

18.     Other persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as Defendants in this Complaint.

19.     Each Defendant acted as a principal or an agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## INTERSTATE TRADE AND COMMERCE

20.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

21.     During the Class Period, Defendants manufactured, sold, and shipped substantial quantities of Electric Powered Steering Assemblies in a continuous and uninterrupted flow of interstate and foreign commerce.

## ELECTRIC POWERED STEERING ASSEMBLIES

22.     Electric Powered Steering Assemblies were manufactured, distributed or sold by Defendants during the Class Period and are not functionally distinguishable from each other in any material respect.

23.     Direct purchasers of Electric Powered Steering Assemblies include original equipment manufacturers ("OEMs"), tier 1 manufacturers and other direct purchasers.

24.     OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S. For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia.

25.     OEMs purchase Electric Powered Steering Assemblies directly from Defendants and install them in new motor vehicles as part of the manufacturing process.

26.     In addition to OEMs, others, including tier 1 manufacturers, purchase Electric Powered Steering Assemblies directly from Defendants. Tier 1 manufacturers supply Electric

Powered Steering Assemblies directly to OEMs. Tier 1 manufacturers either manufacture the individual components for inclusion in Electric Powered Steering Assemblies or purchase those components from tier 2 manufacturers.

27.     Defendants may supply components of Electric Powered Steering Assemblies directly to an OEM, or directly to others, including tier 1 manufacturers that assemble Electric Powered Steering Assemblies for sale to the OEM.

28.     When purchasing Electric Powered Steering Assemblies, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers. For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform. In response, motor vehicle parts suppliers submit quotations or bids, and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years. Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

29.     Defendants and their co-conspirators supplied Electric Powered Steering Assemblies to tier 1 manufacturers and OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Electric Powered Steering Assemblies (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) outside the United States for installation in motor vehicles manufactured outside the United States for export to and sale in the United States.

30.     During the Class Period, Defendants and their co-conspirators sold Electric Powered Steering Assemblies directly to OEMs, suppliers to OEMs such as tier 1 manufacturers, distributors, and other purchasers.

31.     During the Class Period, Defendants and their co-conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Electric Powered Steering Assemblies. As a result of their unlawful conduct, Defendants did not compete, but instead conducted their business insulated from competition.

## THE CHARACTERISTICS OF THE MARKET FOR ELECTRIC POWERED STEERING ASSEMBLIES ARE CONDUCIVE TO COLLUSION

32.     Several important economic characteristics of the market for Electric Powered Steering Assemblies render it plausible that there was collusion among Electric Powered Steering Assemblies suppliers. Specifically, the Electric Powered Steering Assemblies market: (1) has high barriers to entry; (2) is price inelastic; and (3) provides opportunities for collusion.

### *High Barriers to Entry*

33.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing. New entrants would, in turn, decrease the market power of the co-conspirators and diminish their ability to successfully maintain supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Therefore, high barriers to entry help facilitate a cartel.

34.     There are high barriers to entry in the market for Electric Powered Steering Assemblies. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including capital

expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor. A new entrant would also need assured relationships with significant customers in order to justify its substantial investments of capital.

35. Additionally, OEMs cannot easily change Electric Powered Steering Assemblies suppliers after a supplier is initially selected, because Electric Powered Steering Assemblies are integrated with the electronics, mechanics and other features of the particular vehicle model they are installed in. Thus, the design must be synergized by the Electric Powered Steering Assemblies manufacturers and OEMs. It would be difficult for a new market entrant to do this.

*Price Inelasticity*

36. When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic. In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic. Otherwise, increased prices would result in declining sales, revenues, and profits.

37. Electric Powered Steering Assemblies are required for vehicles that use them; there are no viable substitute products. Therefore, pricing for Electric Powered Steering Assemblies is highly inelastic.

*Opportunities for Collusion*

38. Defendants attended industry events that created opportunities to conspire. Such industry events provided myriad opportunities to meet, conspire, and share information.

## DEFENDANTS' ANTITRUST CONSPIRACY

39. During the Class Period, Defendants and their co-conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Electric Powered Steering Assemblies sold in or into the United States.

40.     Defendants and their co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy.

41.     Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss bids and price quotations for Electric Powered Steering Assemblies sold in or into the United States.

42.     Defendants and their co-conspirators agreed during their meetings, conversations, and communications to allocate among themselves the business of supplying Electric Powered Steering Assemblies sold in or into the United States.

43.     Defendants sold Electric Powered Steering Assemblies to customers in the United States and elsewhere at collusive and non-competitive prices.

44.     Defendants accepted payments for Electric Powered Steering Assemblies sold in the United States and elsewhere at collusive and non-competitive prices.

45.     Defendants and their co-conspirators agreed during their meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

46.     Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

47.     Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

48.     Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

49.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

50.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

51.     Generally, RFQ contracts are awarded to the supplier that submits the lowest bid and last for the life of a vehicle model (approximately five years).

52.     When OEMs purchase Electric Powered Steering Assemblies directly from the supplier to whom they awarded the contract, they do so at the winning price.

53.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Electric Powered Steering Assemblies directly from the winning bidder for incorporation into products manufactured for and sold to OEMs. Those suppliers and other direct purchasers who directly purchase Electric Powered Steering Assemblies from the winning bidder pay the winning bidder at least the winning price. The OEM price sets the floor for pricing of Electric Powered Steering Assemblies.

54.     Defendants' conduct persisted for at least seven years (2005-2012). Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

55.     Among other conduct, Defendants manipulated the RFQ process to accomplish their conspiracy.

56.     Defendants and their co-conspirators coordinated their Electric Powered Steering Assemblies pricing.

57.     Defendants and their co-conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy. These activities included, but were not limited to, the following:

a.     Agreeing to unlawfully coordinate pricing for, and allocate sales of, Electric Powered Steering Assemblies.

b.     Discussing and exchanging pricing information with regard to Electric Powered Steering Assemblies RFQs and reaching conspiratorial agreements with respect to RFQs.

58.     Defendants and their co-conspirators knew and intended that their actions regarding their sales of Electric Powered Steering Assemblies to motor vehicle manufacturers would have a direct impact on prices for Electric Powered Steering Assemblies sold to all direct purchasers in the United States.

59.     Defendants' price-fixing conspiracy involving Electric Powered Steering Assemblies impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Electric Powered Steering Assemblies.

**ANTITRUST INVESTIGATION**

60.     The DOJ Antitrust Division's broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry is the largest criminal investigation the Antitrust Division has ever pursued. The ongoing investigation of price-fixing and bid-rigging in the automobile parts industry has yielded over $2.5 billion in criminal fines.

61.     On September 26, 2013, the DOJ announced that JTEKT Corporation had agreed to pay a $103.27 million criminal fine and to plead guilty to a two-count criminal Information charging it with, among other things, participating in a combination and conspiracy to suppress

and eliminate competition in the automotive parts industry by agreeing to allocate markets and rig bids for, and to fix, stabilize, and maintain the prices of, Electric Powered Steering Assemblies sold to Nissan Motor Company Ltd. and certain of its subsidiaries in the United States and elsewhere from 2005 to October 2011 in violation of the Sherman Act, 15 U.S.C. § 1.

62.     On April 23, 2014, the DOJ announced that Showa Corporation had agreed to pay a $19.9 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, pinion-assist type Electric Powered Steering Assemblies sold to Honda Motor Company Ltd. and certain of its subsidiaries in the United States and elsewhere, from at least as early as 2007 until as late as September 2012, in violation of the Sherman Act, 15 U.S.C. § 1.

63.     On October 16, 2014, the DOJ announced that Akira Wada, a former executive of Showa Corporation, had been indicted for his participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets and to fix, stabilize, and maintain the prices of pinion-assist type Electric Powered Steering Assemblies sold to Honda Motor Company Ltd. and certain of its subsidiaries in the United States and elsewhere.

64.     On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. had agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by fixing prices and rigging bids for steering columns sold to certain subsidiaries of Honda Motor Company Ltd., in the United States and elsewhere, from at least as early as the fall of 2007 and continuing until as late as September 2012, in violation of the Sherman Act, 15 U.S.C. § 1.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action on behalf of itself, and, pursuant to Federal Rules of

Civil Procedure 23(a) and 23(b)(3), as the representatives of a Class defined as follows:

> All direct purchasers of motor vehicle Electric Powered
> Steering Assemblies in the United States from any of the
> Defendants (or their controlled subsidiaries, affiliates, or
> joint-ventures) between at least as early as January 2005
> and September 2012.

66.    Members of the Class are so numerous and geographically dispersed across the

United States that joinder is impracticable. The exact number of Class members is unknown to

Plaintiff. The identity of the members of the Class can be readily determined from information

and records Defendants possess.

67.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff

and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*,

they have paid artificially inflated prices for Electric Powered Steering Assemblies as a result of

Defendants' anticompetitive and unlawful conduct.

68.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

69.    Plaintiff is represented by counsel experienced and competent in the prosecution

of antitrust class action litigation.

70.    Questions of law and fact common to members of the Class predominate over

questions that may affect only individual Class members, because Defendants have acted on

grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in

Defendants' anticompetitive and unlawful conduct.

71.    There are core questions of law and fact common to the Class, such as:

     a.     Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, or to allocate or rig bids for, Electric Powered Steering Assemblies;

     b.     Who participated in the conspiracy and how long it lasted;

     c.     Whether the conspiracy caused Electric Powered Steering Assemblies prices to be higher than they otherwise would have been;

     d.     Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

     e.     Whether Defendants' conduct violated Section 1 of the Sherman Act;

     f.     Whether Defendants undertook actions to conceal their unlawful conspiracy; and

     g.     How to measure the damages suffered by the Class.

72.     A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system. A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

**ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS**

73.     Defendants' anticompetitive conduct has had the following effects:

     a.     price competition has been restrained, suppressed, or eliminated with respect to Electric Powered Steering Assemblies;

     b.     the prices of Electric Powered Steering Assemblies have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      purchasers have been deprived of free and open competition in the Electric

Powered Steering Assemblies market.

74.      As a result of Defendants' contract, combination, or conspiracy, Plaintiff and

other Class members paid higher prices for Electric Powered Steering Assemblies than they

would have in the absence of the conspiracy, and Plaintiff and other Class members have

sustained injury to their business or property.

## PLAINTIFF'S CLAIMS ARE TIMELY

75.      Plaintiff and other Class members had no knowledge of the anticompetitive

conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth

herein, until (at the earliest) September 26, 2013, the date that the DOJ publicly announced

Defendant JTEKT Corporation's anticipated guilty plea for its role in the criminal price-fixing

conspiracy alleged herein.

76.      Plaintiff and other Class members did not discover, and could not have discovered

through the exercise of reasonable diligence, the existence of the conspiracy alleged herein

before that date.

77.      No information about the Electric Powered Steering Assemblies conspiracy was

in the public domain or otherwise available to Plaintiff or the Class prior to September 26, 2013.

Until then there was insufficient information to suggest that Defendants were involved in an

Electric Powered Steering Assemblies conspiracy. For these reasons, the statute of limitations as

to Plaintiff's and the Class's claims did not begin to run until (at the earliest) September 26,

2013.

78.      Fraudulent concealment by Defendants also tolled the statute of limitations on the

claims asserted by Plaintiff and the Class until at least September 26, 2013. Defendants

16

affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class, from at least as early as January 2005 through at least September 2013. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to this Complaint.

79.     Before at least September 26, 2013, Plaintiff and the Class were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Electric Powered Steering Assemblies during the Class Period. No information, actual or constructive, was ever made available to Plaintiff or other members of the Class that would have suggested that they were being injured by Defendants' unlawful conduct.

80.     The affirmative acts by the Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

81.     By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing. Because Electric Powered Steering Assemblies are not exempt from antitrust regulation, Plaintiff and the Class reasonably believed that the market for Electric Powered Steering Assemblies was competitive.

82.     Defendants represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements. In making those false representations, Defendants misled Plaintiff and the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

83.     Defendants' wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

84.     In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

85.     During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

86.     Defendants likewise agreed to allocate the supply of Electric Powered Steering Assemblies sold to customers in the United States and elsewhere on a model-by-model basis.

87.     Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

88.     In accordance with their agreements, Defendants submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

89.     Plaintiff and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their conduct.

90.     For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled, and did not begin to run until at least September 26, 2013.

**COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

91.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth here.

92.     Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

93.     The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

94.     Commencing at least as early as January 2005 and continuing until the present, the exact dates being currently unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Electric Powered Steering Assemblies, creating anticompetitive effects.

95.     Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Electric Powered Steering Assemblies throughout the United States.

96.     As a result of the conspiracy alleged herein, the prices charged to Plaintiff and the other members of the Class for Electric Powered Steering Assemblies were unlawfully raised, fixed, maintained, or stabilized in the United States.

97.     The conspiracy has had the following effects:

a.      Prices paid by Plaintiff and the Class for Electric Powered Steering Assemblies were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.      Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Electric Powered Steering Assemblies; and

c.      Competition in the market for Electric Powered Steering Assemblies has been unlawfully restrained, suppressed, or eliminated.

98.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been damaged, and will continue to be damaged, by paying supra-competitive

prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

99.   The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.   That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.   That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.   That Plaintiff and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.   That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.   That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiff and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: June 14, 2016

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
38500 Woodward Ave; Ste. 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

*Interim Liaison Counsel for Plaintiff Saratoga Lane LLC. and the Proposed Class*

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Michael S. Smith
PRETI FLAHERTY BELIVEAU & PACHIOS, LLP
One City Center, P.O. Box 9546
Portland, ME 04112
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whose@kohnswift.com
dabrahams@kohnswift.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com

*Interim Lead Counsel for Plaintiff Saratoga Lane LLC and the Proposed Class*

M. John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
(561) 515-1431

Matthew W. Ruan
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797

David A. Young
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue NW; Suite 500
Washington, DC 20005
(202) 408-4600

Solomon B. Cera
Thomas C. Bright
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
(415) 777-2230

22

Irwin B. Levin
Scott D. Gilchrist
COHEN & MALAD LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481

W. Joseph Bruckner
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South; Suite 2200
Minneapolis, MN 55401
(612) 339-6900

Robert N. Kaplan
Gregory K. Arenson
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Lee Albert
GLANCY PRONGAY &
MURRAY LLP
1925 Century Park East; Suite 211
Los Angeles, CA 90067
(310) 201-9150

Linda P. Nussbaum
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102

R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
(415) 217-6810

*Other Counsel for Plaintiff Saratoga Lane LLC and the Proposed Class*